423 F.Supp. 615 (1976)
Doris MOSBY, Plaintiff,
v.
WEBSTER COLLEGE, Defendant.
No. 75-79C(2).
United States District Court, E. D. Missouri, E. D.
July 27, 1976.
David A. Lang, St. Louis, Mo., for plaintiff.
Wayne L. Millsap, Clayton, Mo., for defendant.

MEMORANDUM
REGAN, District Judge.
Alleging that Webster College discriminated against her on the basis of her race by its decision not to renew her teaching contract and by refusing to promote her to the rank of full professor, plaintiff seeks both Title VII and Section 1981 relief.
Plaintiff, a black woman, was employed by the College for the 1972-1973 academic year in the full-time position of Associate Professor with responsibilities in both the undergraduate psychology department and the graduate Master of Arts in Teaching (MAT) programs. Her duties also included participation in faculty workshops and institutes, and in the academic advisory program and commencement. Her salary was $12,000 plus fringe benefits including free tuition for her husband who was seeking a master of arts degree. She was reemployed for the following academic year on the *616 same terms except for the amount of compensation (which was slightly higher).
It is clear from the evidence that the College had been for some time interested in developing a special education program,[1] and that plaintiff was aware, prior to her employment, that she would be required to design and teach courses in such a program. During the course of the discussions which culminated in her employment, plaintiff expressed both a willingness and ability to do so. However, in the fall of 1972, plaintiff refused to teach a course in the special education program on the ground she was not qualified. As a result, the College employed another person to teach the course at additional expense. In January, 1973, plaintiff submitted a proposal for a special education major but this was rejected as unrealistic and unsatisfactory. Another proposal plaintiff submitted in January, 1974 after being notified that her contract would not be renewed was equally unsatisfactory.
Although aware of the high priority placed by defendant on adequate academic advising of students by faculty members, plaintiff was frequently unavailable to students who had been assigned to her for advising.[2] When this problem (together with the fact of student complaints relating thereto) was discussed with plaintiff, her attitude was that she should receive additional compensation for the performance of such duties.
In the spring semester, plaintiff was requested to undertake the additional duties of supervision of special education student-teachers in the following academic year. Again, plaintiff took the position that she should be given additional remuneration for such assignment.
Under the guidelines of the American Association of University Professors (AAUP) to which defendant strictly adheres, first year faculty members may not be terminated unless notified by March 15. By the time plaintiff's attitude toward student advising and apprentice teaching supervision had become clear, the March 15 deadline had passed. Although plaintiff subsequently assumed the supervisory duties without additional compensation, this was due, not to a change of mind on plaintiff's part, but to a reduction of her teaching load from nine to six hours. However, plaintiff refused to assume the responsibilities of an advisor to freshman in addition to her departmental advisees, claiming that her other advisory and supervisory duties would be too time-consuming.[3]
During the fall semester of 1973, in accordance with its then policy, defendant commenced an evaluation of plaintiff for the purpose of determining whether there should be a second renewal of her contract. Other non-tenured faculty members were also evaluated. In view of an AAUP deadline of December 15, 1973, by which second year faculty members were required to be notified of non-renewal, the evaluation had to be finalized by that date. As the result of the evaluation of plaintiff, defendant determined not to renew her contract, and so notified her on December 14, 1973, thus affording her a full semester thereafter within which to secure other employment. Four white teachers were also given notification of non-renewal after similar evaluations.
*617 Among the factors which (cumulatively) led to defendant's decision to terminate plaintiff were negative student reaction to plaintiff's teaching ability and methods in certain courses, her indifference to advising students and student complaints respecting plaintiff's advising unavailability, her professed inability to teach special education courses (contrary to her pre-employment representations), and her general unwillingness to advise. Subsequently, defendant learned of plaintiff's failure to submit a letter of recommendation to a psychology major in spite of her assurances that she would (and did) do so.
At the time the evaluation procedures were commenced, plaintiff applied for a promotion from associate to full professor. Although she had not served four years as associate professor (as normally required) the Faculty Committee on Tenure, Rank and Sabbatical granted plaintiff an "exception" for the purpose of considering her application. On December 13, 1973, the Committee made a negative recommendation to Dr. Gerdine, the president of defendant, who had the ultimate authority on matters of retention and promotion. Among the criteria considered were the quality of plaintiff's teaching (an adverse finding indicated in large part in negative student statements), her professional relationship with students (an adverse finding indicated in the manner she handled advising duties), her contribution to the department (an adverse finding indicated in her unwillingness to assume departmental advisees and to teach special education courses), and her contribution to the college (an adverse finding indicated by her inability or unwillingness to develop a practical and sound special education program).[4]
Plaintiff relies in large part on the standard enunciated in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972), contending that she made a prima facie case by showing she is black, that she was discharged and that she was replaced by a white in the duties she performed while at the College. The Green case also requires a finding that the employee be qualified for the job. The issue here, however, is not whether plaintiff made a prima facie case, but whether on the evidence, considered as a whole, she should prevail.
In our opinion, defendant made a good faith judgment that plaintiff's performance of her prescribed duties as Associate Professor did not meet the standards of the College. Obviously, in judging the performance of an employee, particularly as concerns a teacher, subjective criteria cannot be entirely avoided. The fact that plaintiff may have been technically "qualified" for the position when she was hired (although as to special education she was not, by her own admissions) may not be equated with satisfactory performance of the duties of a teacher in an institution of higher learning. As we view the evidence, it is apparent that had plaintiff not been a black woman, it is unlikely that she would have been given the second year opportunity. And certainly, when defendant was compelled under AAUP time limitations to decide whether to notify plaintiff of non-renewal of her contract, it had become obvious there was ample "good cause" for termination of the teacher-college relationship. What could be more "job-related" or greater "business necessity" in an educational institution (particularly at the college level) than satisfactory teaching performance? So, too, the fact that some of the additional justifications for plaintiff's termination did not surface until later does not, in the context of this case make the original reasons pretexual. Thus, the fact that plaintiff did not disclose to defendant that she was engaged in outside practice not only evidences lack of candor on her part but serves to support defendant's claim that she was unavailable for advising. The over-all cumulative effect of plaintiff's deficiencies in performance was sufficient to impel defendant to *618 finally decide against renewal of plaintiff's contract and not to promote her.
The history of Webster College clearly refutes any possible inference of anti-black bias generally or specifically and there is no evidence at all that plaintiff was personally discriminated against because she is black. We find from the overwhelming weight of the credible evidence that plaintiff's race played no part whatever in defendant's decisions to terminate her employment and not promote her. Defendant violated no rights secured to plaintiff under either Title VII or Section 1981, 42 U.S.C. It follows that defendant is entitled to judgment. The foregoing memorandum constitutes our findings of fact and conclusions of law.
NOTES
[1] This program comprehended the training of teachers to teach children evidencing symptoms of learning disabilities, hyperkinesis, emotional disturbance, educable mental retardation, dyslexia, autism and aplasia.
[2] Subsequent to the institution of this action, it developed that plaintiff, in violation of defendant's policy of candor, did not inform the College that she maintained an outside independent practice. It is evident that plaintiff's unavailability for advising stemmed in large part from this fact.
[3] In refusing to perform these responsibilities, plaintiff stated that she anticipated 30 students would be involved in the apprentice teaching program. In the first 1973-1974 semester there were none, and only three students were supervised in the second semester. She advised some six departmental majors, as opposed to approximately 30 who were advised by each of her colleagues in the Psychology Department.
[4] One of the requirements for advancement to full professorship was that the teacher achieve an extraordinary level of contribution to the College, and the Committee found that plaintiff had fallen substantially short of doing so.