573 F.Supp. 300 (1983)
Eldwyn LEWIS, Plaintiff,
v.
ST. LOUIS UNIVERSITY, Defendant.
No. 80-1454C(D).
United States District Court, E.D. Missouri.
September 28, 1983.
*301 Doris G. Black, St. Louis, Mo., for plaintiff.
Bryan, Cave, McPheeters & McRoberts, Dennis C. Donnelly, Michael P. Burke, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This matter is before the Court for a decision on the merits following a three day trial ending April 7, 1983. Plaintiff seeks judgment on a three-count complaint which alleges that defendant unlawfully discriminated on the basis of race in discharging plaintiff from a faculty and administrative position with the University, and that defendant retaliated against plaintiff for filing an E.E.O.C. charge, by refusing to permit plaintiff to complete his doctoral degree. A fourth count alleging breach of contract was earlier dismissed by the Court on jurisdictional grounds. Plaintiff seeks reinstatement, back wages, punitive damages and readmission to the doctoral program.
After conclusion of the testimony adduced at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, the Court hereby makes and enters the following findings of fact and *302 conclusions of law pursuant to Fed.R.Civ.P. 52(a). Any finding of fact equally applicable as a conclusion of law is hereby adopted as such, and any conclusion of law equally applicable as a finding of fact is hereby adopted as such.

Findings of Fact
1. Plaintiff Eldwyn Lewis is a black male citizen of the United States and a resident of St. Louis County, Missouri.
2. Defendant St. Louis University (hereinafter the University) is a corporation organized and existing under and by virtue of law and is an employer engaged in industry affecting commerce and employs more than fifteen (15) persons.
3. Plaintiff was hired by the University effective January 1, 1974 as the Director of the University's Afro-American Studies Institute (also sometimes referred to as the Afro-American Studies Program) and was also given a position as an instructor in the University's Department of Sociology and Anthropology. For the subsequent academic years of 1974-75, 1975-76 and 1976-77, plaintiff was reemployed in these positions under separate one-year contracts.
4. At all relevant times, plaintiff was under the administration of Dr. Thomas R. Knipp, Dean of the College of Arts and Sciences (hereinafter Dean Knipp), with respect to both his administrative position as Director of the Afro-American Studies Institute (hereinafter the Institute), and his faculty position as instructor in the Department of Sociology and Anthropology.
5. At the end of the 1976-77 academic year, plaintiff was not reappointed as Director of the Institute and his duties in that position ended as of June 30, 1977.
6. The University's decision not to reappoint plaintiff as Director of the Institute was based upon the recommendation of Dean Knipp. Dean Knipp based his recommendation solely on a good faith belief that plaintiff's performance in his position was totally unsatisfactory, that as a result the Institute was not effective, and that plaintiff did not have the abilities or proper attitude to accomplish the objectives of the University. Dean Knipp's recommendation was largely a result of a report issued in 1977 by the Afro-American Studies Advisory Board, which identified numerous deficiencies in the operation and management of the Institute.
7. On or about May 27, 1977, the University notified plaintiff that his faculty appointment as an instructor in the Department of Sociology and Anthropology would end as of June 30, 1978, upon completion of a final year (1977-78) in that position. Plaintiff was also informed that his salary for the final year would be decreased from $20,000 to $15,000.
8. The University's decision not to rehire plaintiff as an instructor was based upon two factors. First, the faculty position occupied by plaintiff was not a permanent, funded position, but rather was a "add-on" position occupied by plaintiff because of his position as Director of the Institute. Thus, when he was terminated as Director, there was no longer any basis or source of funds to retain him as a faculty member. After plaintiff was terminated, his position was not filled by the University. Second, at the time the decision to terminate plaintiff was made, plaintiff had failed to make significant progress toward completion of his doctorate degree. The University considered the doctorate to be essential to continuing as a faculty member.
9. Following the negative recommendation made by Dean Knipp regarding plaintiff's performance, plaintiff responded by letter to Dr. Edwin Eigel, Academic Vice-President of the University. Plaintiff disputed Dean Knipp's allegations and provided to Dr. Eigel documentary support for his position. After considering plaintiff's position, Dr. Eigel made the decision to terminate plaintiff as Director of the Institute and so notified plaintiff on or about July 15, 1977.
10. Plaintiff appealed the decision of Dr. Eigel to the President of the University (hereinafter the President) by letter dated August 17, 1977, in which he complained *303 that "the procedures for non-reappointment in this case were arbitrary and prejudicial in nature."
11. To advise him in this matter, the President appointed an ad hoc committee (hereinafter the Committee) made up of three tenured faculty members, each of whom was subject to plaintiff's approval. One faculty member initially selected was in fact disapproved by plaintiff and was replaced.
12. The Committee conducted a review of the decisions made by the University regarding the termination of plaintiff's services. The Committee held a hearing at which pertinent witnesses, including the plaintiff, appeared and were questioned. The Committee then submitted its report to the President which included recommendations that plaintiff be evaluated by the faculty members of the Sociology Department for possible reinstatement and that plaintiff be paid the sum of Five Thousand Dollars ($5,000) to make up the difference between the Fifteen Thousand Dollar ($15,000) salary plaintiff received for the 1977-78 academic year, and the Twenty Thousand Dollar ($20,000) salary plaintiff had received for the preceding academic year.
13. The recommendations of the Committee were accepted and implemented in full by the University. Plaintiff was paid Five Thousand Dollars ($5,000) in June of 1978. The Department of Sociology conducted an evaluation of plaintiff's qualifications and received written comments from faculty members and from plaintiff. The report was submitted to Dr. Eigel on May 18, 1978 and recommended against reinstatement of plaintiff to the faculty.
14. The decision of the University not to reappoint plaintiff to the position of Director of the Institute and Instructor of Sociology and Anthropology was based solely upon its perception of plaintiff's professional qualifications and performance, and was in no way related to plaintiff's race.
15. On September 22, 1977, plaintiff filed a charge with the Equal Employment Opportunity Commission (hereinafter E.E. O.C.) claiming that the University had discriminated against him because of his race "in regard to demoting me from my administrative position, decreasing my wages and limiting me to a one-year contract." On July 27, 1978, the E.E.O.C. issued its final determination finding no reasonable cause to believe plaintiff's allegations were true.
16. On September 14, 1978, based upon essentially the same allegations, plaintiff filed an action against the University in the United States District Court for the Eastern District of Missouri, No. 78-965(3) alleging discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, as well as 42 U.S.C. § 1981. This action was dismissed without prejudice on January 28, 1980.
17. Plaintiff entered the University's doctoral program in 1971, with a requirement that he complete the degree within five (5) years. Thus, the initial time limit to complete the degree expired in 1976.
18. In November, 1978, plaintiff contacted his faculty advisor, Dr. William Monahan, and sought a seven month extension of time to complete the dissertation requirement for his Ph.D. Degree. Dr. Monahan responded by recommending that plaintiff reevaluate the time needed for completion and recommending that he submit a schedule for completion of the degree which would eliminate the need for any subsequent extension.
19. In January, 1979, plaintiff submitted to the University a formal petition requesting a twelve-month extension and including a timetable for completion of the degree. The petition was approved by Dr. Steven Vago, Chairman of the Department of Sociology and Anthropology. The approval was expressly contingent on the condition that plaintiff abide by the timetable and that no further extensions would be permitted without special action by the Graduate Board of Studies.
20. All students seeking a doctorate at the University are required to present their dissertation proposal and defend it before the faculty at a "colloquium", before proceeding *304 to complete the dissertation. Plaintiff prepared his dissertation proposal and presented it on December 19, 1979, nearly eight months after the date set in the timetable submitted by the plaintiff in his request for extension of time, and less than two months before the scheduled date of completion of the project.
21. It is the practice of the Department of Sociology and Anthropology with regard to all Ph.D. candidates for all faculty members to attend the colloquium and determine collegially whether a particular proposal meets the criteria set forth by the University. This objective criteria is set forth in the University's graduate school bulletin.
22. In plaintiff's case, the faculty determined that plaintiff's proposal was not acceptable. This determination by the faculty was based upon the University criteria; the determination was made in good faith by the faculty members of the Department of Sociology and Anthropology; and the determination was not in any way related to plaintiff's previous complaints filed with the E.E.O.C.
23. Plaintiff was notified immediately of the faculty's decision and was provided with a full explanation of the faculty's reasons by letter from Dr. Monahan dated December 21, 1983.
24. Plaintiff did not thereafter seek to modify his proposal to correct the deficiencies identified by the faculty during the colloquium. Nor did plaintiff make a request to the Department for an additional extension of time to complete his dissertation. The failure of plaintiff to pursue these options was based upon plaintiff's subjective belief as to the probability of their success.

Conclusions of Law
This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1343. Defendant St. Louis University is an employer within the meaning of 42 U.S.C. § 2000e(b).
Plaintiff alleges that the University violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 by refusing to renew his employment contract because of his race, and by maintaining discriminatory employment practices and policies (Count I and II). Plaintiff further alleges that the University violated Title VII and § 1981 in that it retaliated against plaintiff for filing discrimination charges against the University, by failing to approve plaintiff's dissertation proposal and by failing to give him sufficient time to complete his doctoral degree (Count IV).
In an employment discrimination case, the initial burden is on the plaintiff to prove by a preponderance of the evidence a prima facie case of discrimination. Assuming such a case is presented, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for rejection of the employee. Finally, the plaintiff must be provided an opportunity to show that the reasons offered are but a pretext for a discriminatory motive. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981). The plaintiff, however, bears the ultimate burden of persuading the court that he has been the victim of discrimination. Id. at 256, 101 S.Ct. at 1095. Hence, the issue now before the Court is whether on the evidence, considered as a whole, the plaintiff has proven discriminatory acts by the defendant.
Plaintiff's initial burden in a discriminatory hiring case may be met by showing that he belongs to a racial minority, that he was qualified for but was rejected from the job the employer was filling, and that the position remained open and the employer sought to fill the position after such rejection. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The Green test is equally applicable to a discharge case as it is to a hiring case. Williams v. Trans World Airlines, Inc., 660 F.2d 1267, 1271 (8th Cir.1981).
*305 The Court concludes that there has been no such showing in the present case. First, there has been no showing that plaintiff was qualified for the position. In judging the qualifications of an individual in a teaching position subjective criteria are essential. As the Court noted in Mosby v. Webster College, 423 F.Supp. 615, 617 (E.D.Mo.1976), aff'd 563 F.2d 901 (8th Cir. 1977),
[t]he fact that plaintiff may have been technically "qualified" for the position when she was hired ... may not be equated with satisfactory performance of the duties of a teacher in an institution of higher learning (emphasis in original).
The Court views the evidence as establishing numerous deficiencies in plaintiff's ability to carry out the responsibilities called for by his position. In the opinion of the Court, therefore, plaintiff has failed to establish that he was qualified to hold his position.
Aside from the question of plaintiff's qualifications for the position, however, plaintiff has failed to establish that he was replaced after his non-reappointment. To the contrary, the evidence reveals that the position was in fact not filled after plaintiff's departure; nor is there any evidence that it has been filled to this date.
In order to prevail under a theory of disparate treatment,[1] plaintiff must show a difference in treatment between him and non-minority members, and a discriminatory motive on the part of the employer. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). Discriminatory motive can in some situations be inferred from the mere fact of differences in treatment. Id. at p. 335, n. 15, 97 S.Ct. at p. 1854 n. 15.
The plaintiff in the present case has not made any showing of treatment by defendant of black faculty or administrative members that is any different from that of white members. There is simply no basis upon which to establish disparate treatment by the University.
The Court views plaintiff's charges of retaliation with regard to his dissertation proposal as akin to that of a retaliatory discharge. In such a case, plaintiff must show as part of his prima facie case: (1) that he engaged in an activity protected by Title VII; (2) that an adverse employment action occurred; and (3) there was a causal connection between the activity and the adverse action. Dickerson v. Metropolitan Dade County, 659 F.2d 574, 580 (5th Cir.1981). Beyond his own perceptions of the motivations of two professors,[2] plaintiff has presented no evidence linking the disapproval of his proposal to the filing of his E.E.O.C. charge two years earlier, or the lawsuit fifteen months earlier. Considering the reasonable inferences on the basis of all evidence presented, the Court simply cannot conclude that the rejection was based in any way on plaintiff's previous legal actions against the University.
On the basis of the foregoing considerations, the Court concludes that plaintiff has failed to bear his ultimate burden of showing that he has been the victim of racial discrimination.
NOTES
[1] A prima facie case possibly could be established under a disparate impact theory as well. See Ward v. Arkansas State Police, 714 F.2d 62 at 64-65 (8th Cir.1983) at 3-4. However, plaintiff has neither argued nor presented evidence under this theory.
[2] Plaintiff concedes that the "hostility" shown to him by one of the professors who rejected his proposal had been going on since long before his charges or lawsuit were ever filed.